# In the Matter of:

# John MacArthur v. O'Connor Corporation

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## Daniel Thibodeau

## July 31, 2007

CAPITOL
COURT REPORTING

931 Jefferson Blvd., Suite 2003
Warwick, Rhode Island 02886
401.739.3600 - phone 401.739.3665 - fax
www.capitolcourtreporting.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JOHN MACARTHUR | : | |
| | : | |
| vs. | : | C.A. NO. 06-478S |
| | : | |
| O'CONNOR CORPORATION and O'CONNOR CONSTRUCTORS, and O'CONNOR SAFETY CORPORATION | : | |
| | : | |
| vs. | : | |
| | : | |
| THE BERLIN STEEL CONSTRUCTION COMPANY and HARTFORD FIRE INSURANCE COMPANY | : | |

VIDEOTAPED DEPOSITION OF DANIEL THIBODEAU

Tuesday, July 31, 2007

10:00 a.m.

The Law Firm of Thomas A. Tarro, III

300 Centerville Road

Summit East, Suite 330

Warwick, Rhode Island 02886

– – –

Heather A. Lussier, CSR
Capitol Court Reporting, Inc.
931 Jefferson Boulevard
Warwick, Rhode Island 02886

(401) 739-3600

APPEARANCES

For the Plaintiff:

THOMAS A. TARRO, III, ESQ.
THE LAW FIRM OF THOMAS A. TARRO, III
300 Centerville Road
Summit East, Suite
Warwick, Rhode Island 02886

For the Defendant:
(O'Connor Corporation & O'Connor Constructors)

JAMES H. REILLY, ESQ.
KELLY, KELLEHER, REILLY & SIMPSON
146 Westminster Street, Suite 500
Providence, Rhode Island 02903

For the Defendant:
(Hartford Fire Insurance Company)

AMY PARKER, ESQ.

MORRISON MAHONEY, LLP

121 South Main Street, Suite 600

Providence, Rhode Island 02903

ALSO PRESENT:

John MacArthur

William White, Videographer

# INDEX


| DEPONENT: | PAGE |
|---|---|
| DANIEL THIBODEAU | |
| DIRECT EXAMINATION BY MR. TARRO | 6 |


## EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Plaintiff's | | |
| 1 | Notice of Deposition (8 PP) | 5 |
| 2 | Agreement For Continuing Services (10 PP) | 5 |
| 3 | Agreement For Continuing Services (10 PP) | 5 |
| 4 | Agreement For Continuing Services (10 PP) | 5 |
| 5 | Agreement For Continuing Services (14 PP) | 5 |

| | | |
|---|---|---|
| 6 | Safety Manuel, 11.0 Subcontractor Safety Program (13 PP) | 5 |
| 7 | Letter dated March 24, 2005 (1 PP) | 5 |
| 8 | Safety Manual, Safety Policy Statement (1 PP) | 5 |
| 9 | Safety Manuel, 9.1 Ladders and Temporary Stairways (2 PP) | 5 |
| 10 | Safety Manual, 4.0 Incident Reporting and Investigations (7 PP) | 5 |
| 11 | Safety Manual, 2.0 Organization and Responsibilities (4 PP) | 5 |
| 12 | The Berlin Steel Construction Company, Accident/Injury Investigation Report (1 PP) | 5 |
| 13 | Job Planning and Safety Analysis (1 PP) | 5 |

(ALL EXHIBITS ATTACHED TO TRANSCRIPT)

(COMMENCED AT 10:05 A.M.)

(Plaintiff's Exhibit Numbers 1 through 13 marked)

THE VIDEOGRAPHER: We're on the record. Today's date is July 31st, 2007. The time is 10:05. My name is William White. I'm the videographer. We're here in the matter of James MacArthur versus O'Connor Corp., et al, the United States District Court for the District of Rhode Island, C.A. Number 06-478S.

Will the attorneys identify themselves for the record.

MR. TARRO: Okay. With regard to the caption, it's John MacArthur as the Plaintiff. My name is Thomas A. Tarro, III. I represent the Plaintiff, John MacArthur.

MR. REILLY: James Reilly for Defendants O'Connor Corporation.

MS. PARKER: Amy Parker for the Hartford Insurance Company.

MR. THIBODEAU: Dan Thibodeau, O'Connor Corporation.

MR. MACARTHUR: John MacArthur, Plaintiff.

MR. TARRO: Good morning, Mr. Thibodeau. Mr. Thibodeau, we're here today pursuant to a 30(b)6 Notice of Deposition that was filed in this case addressed to O'Connor Corporation, and I've had that marked as Exhibit Number 1.

THE VIDEOGRAPHER: Would you swear the witness.

DANIEL THIBODEAU

Being duly sworn, deposes and testifies as follows:

DIRECT EXAMINATION BY MR. TARRO

Q. Mr. Thibodeau, I've shown you what has been marked as Exhibit Number 1, a Notice of Deposition.

A. Yes.

Q. Have you seen that before today?

A. Yes.

Q. Okay. When was the first time that you received that Notice of Deposition?

A. It was previous to 7/31.

Q. When was it?

A. I can't give you an exact date. I really don't know.

Q. Was it a week ago, two weeks ago, three weeks ago?

A. I would say three weeks ago.

Q. And when you received it, did you read it?

A. Yes.

Q. Okay. And who sent you the Notice of Deposition?

A. Lee Danielson.

Q. And when you received the Notice of Deposition, did Mr. Danielson give you any instructions?

A. He told me to pull all the files that were required because they were requesting originals, and that's what I did.

Q. Okay. Now, what position do you hold at O'Connor Corporation?
A. I am a safety representative.
Q. And with regard to your relationship to O'Connor Safety Corporation, Inc., what is that relationship?
A. I'm a safety representative.
Q. Okay. Who pays your salary?
A. O'Connor Safety Corporation.
Q. Okay. So you get a W-2 from O'Connor Safety Corporation?
A. Yes.
Q. You don't get a W-2 from O'Connor Corporation?
A. No.
Q. Do you get any compensation at all from O'Connor Corporation?
A. No.
Q. Have you ever been paid at any time by O'Connor Corporation?
A. Before the company split, yes.
Q. Okay. When was that?
A. 200 -- I want to say 2003.
Q. All right. And with regard to O'Connor Corporation, have you ever held the position of an officer in the corporation?

A. No.
Q. Have you ever held the position as a director of the corporation?
A. No.
Q. Have you ever held the position -- a managerial position in the corporation?
A. No.
Q. Now, with regard to the Notice of Deposition when you received it from Mr. Danielson, did you read it?
A. Yes.
Q. Okay. And you read it in its entirety?
A. Yes.
Q. And if I ask you to turn to Page 4, and I ask you with regard to this following paragraph, did you read it? And the paragraph states as follows: On or before the July 13th, 2007 O'Connor Corporation is requested to designate, in writing, to the Plaintiff, one or more officers, directors, or managing agents or other persons who consent to testify on its behalf, with the most knowledge concerning the following designated matters, and whom the Defendant will fully prepare to testify regarding the following designated matters, and has such information that is known or reasonably available to O'Connor Corporation. The Deponent is further requested to set forth in the written designation for each person so designated, the

matter or matters on which that person will testify.

When you received the Notice of Deposition, did you read that particular paragraph?

A. Yes.

Q. Okay. Now, did you also read the Paragraphs Numbered 1 through 21 which set forth the subject matter on which this deposition is going to be conducted?

A. Yes.

Q. Okay. Now, with regard to the subject matter on which the deposition is to be conducted, are you the person most knowledgeable at O'Connor Corporation or at O'Connor Safety Corporation with regard to those items?

A. Yes.

Q. Okay. Is there any -- any of the subject matter that you have no knowledge on?

A. When it gets down to legal issues between company to company to company, that's the only issue that I'm not well-versed with.

Q. Okay. Now, with regard to your knowledge of corporate documents, the filing, the location of corporate documents, how did you acquire that knowledge?

MR. REILLY: Can I have a clarification? What do you mean by corporate documents? Are you talking about all the documents that have been produced, or what specifically is

a corporate document?

MR. TARRO: Corporate records.

MR. REILLY: All of the records that have been produced? What is the question?

MR. TARRO: Could you read the question back, please.

(PREVIOUS QUESTION READ BACK BY COURT REPORTER)

MR. REILLY: Do you understand the question?

A. Documents that I deal with or the company deals with in particular?

Q. Corporate records.

A. Corporate records I have nothing to do with.

Q. Okay. With regard to the location of corporate records, do you know where they are located?

A. No.

MR. REILLY: Objection.

Q. With regard to the manner in which corporate records are filed, are you familiar with that?

MR. REILLY: I'm going to object to the term, corporate records. That means every single piece of paper that the company has. So it's way overbroad. To expect any witness to know where every single piece of paper is in a large corporation is an unreasonable question. It's overbroad.

Q. You can answer.
A. No.
Q. I'm sorry?
A. No.
Q. Okay. Are you familiar with the manner in which electronically generated documents are maintained --
MR. REILLY: Objection.
Q. -- at the corporate level?
MR. REILLY: Objection. Beyond the scope of the deposition notice.
A. No.
Q. With regard to the retention policy of the corporation with regard to documents, are you familiar with that policy?
A. No.
MR. REILLY: Objection. Beyond the scope of the deposition notice.
Q. With regard to the retention policy with regard to electronically generated documents, are you familiar with the corporate policy?
MR. REILLY: Objection. You can answer.
A. No.
Q. With regard to the Notice of Deposition, I'll ask you to turn to Page 2 and the paragraph that reads, the deponent is requested to bring with him or her any and all original

documents which are set forth herein on the date of the scheduled deposition and produce a copy of same to the undersigned counsel on or before close of business on Friday, July 13th, 2007. The wood stairs referred to in this notice are the temporary wooden stairs located on Unit 1, Level 5 of the Brayton Point Power Plant as referred to in Plaintiff's Complaint.

Now, when you received the Notice of Deposition, you had occasion to read that paragraph?

A. Yes.

Q. Okay. And you had occasion to read Pages 2 through 4 and Subparagraphs A through O which requested certain documentation?

MR. REILLY: Objection. That's already been asked and answered.

A. Yes.

Q. Did you have occasion to read that, --

A. Yes.

Q. -- the documents requested. Okay. Now, had you brought with you today the original documents?

A. The documents are here.

Q. You have the original documents with you?

A. That I could find, yes.

Q. Okay. With regard to the documents that were produced

to my office in compliance with the notice request, the documents were delivered last week, and they were Bates Stamped Number 1 through 585; is that correct?

A. Yes.

Q. All right. Now, with regard to the documents that were produced and the documents that were requested, did you locate the documents yourself?

A. Yes.

Q. Okay. And where were the documents located?

A. The documents were located in the files from the job.

Q. Well, there's documents requested pertaining to insurance policies, --

A. Those --

Q. -- they're on the job?

A. Those were risk office.

Q. Okay. So you didn't pull those documents yourself?

A. No.

Q. Okay. And there are documents that were requested, any and all agreements between O'Connor Corporation and the Codefendant, O'Connor Constructors, Inc. and O'Connor Safety Corporation. Were those on the job site?

A. No.

Q. Where were those records?

A. Those are from the risk office.

Q. Okay. So did you instruct somebody to get those for you, or were they just provided to you?
A. I asked for them.
Q. Okay. Where is the risk office located?
A. I believe it's one of the offices in the building.
Q. And with regard to any and all electronically created statements, memorandums, notes and journals pertaining to John MacArthur and/or the incident of September 23rd, 2005 when he tripped on wooden stairs located at Unit 1, Level 5, could you tell me how you went about searching for that information?
A. It's all hard copied.
Q. Okay. So you did not make any search of any computers?
A. No. There are no copies of -- or electronic information. No.
Q. All right. Do other safety representatives on the job site who were involved with this incident have their own computers?
A. Yes.
Q. Do they have their own memos and notes?
A. Yes.
Q. Okay. Did you take any steps to check their computers to determine if they had any memos or notes with regard to this incident?

A. Yes.
Q. Okay. Who did you speak to?
A. Don Renovado.
Q. Anyone else?
A. No.
Q. And what did you ask him?
A. I asked him if he had any information on his computer pertaining to the MacArthur case.
Q. What was his response?
A. He didn't have anything.
Q. Okay. And with regard to the documents requested with regard to any and all invoices or statements pertaining to the construction of the wooden stairs on Unit 1, Level 5 including but not limited to the cost of labor, materials used and invoices generated, did you obtain that information?
A. Yes, I did.
Q. Where did you obtain that information from?
A. I obtained that from -- what was it? The purchasing department.
Q. Okay. Where is that located?
A. In the office.
Q. Who did you speak with?
A. I asked Lee where to get it -- Lee Danielson where to get it, and he directed me where to go get it.

Q. So where did he direct you to go get it?
A. To the purchasing department.
Q. You don't know who you spoke to there?
A. I believe it was Marie -- Marie McCloud.
Q. And did you instruct her as to what to look for?
A. I asked her what I was looking for if she could get it for me.
Q. What did you ask her?
A. I asked her for any invoices pertaining to Brayton Point such and such a date.
Q. What's such and such a date?
A. September 23rd.
Q. Well, the request, the document request asked for any and all invoices or statements pertaining to the construction of the wooden stairs on Unit 1, Level 5 including but not limited to the cost of labor, materials used and invoices generated.
A. Uh-huh.
Q. Are you telling me that the only date you requested was September 23rd, 2005?
A. No. I asked for all the paperwork that pertained to that particular job.
Q. And what job was that?
A. Brayton Point Power Plant, Job Number 20 -- I believe

it's 2086.

Q. What does 2086 signify?

A. Just a job number. Designation of a job.

Q. And how does that correlate to the construction of temporary stairs?

A. The job that we were working on -- because of the project was multifaceted, each facet had a number assigned to it so that costs would accordingly be billed to that particular project. 2086 was a number that stuff was billed to for Unit 3.

Q. So you asked that all the invoices pertaining to Job Number 2086 be produced?

A. Yes.

Q. And how many invoices were produced?

A. Pertaining to the specific incident, there were three or four.

Q. All right. And could you identify the three or four that were produced?

A. Yes.

Q. Okay. You want to look at the original documents?

MR. REILLY: Do you want to use the Bates Stamped documents so you can refer to them?

MR. TARRO: That's fine.

A. Now, what do -- do you want the item number?

Q. Well, I want -- I want any and all of the invoices that pertain to the construction of the wooden stairs located on Unit 1 --

A. Yes. But what I'm asking you is how do you want me to designate it to you? Do you want me to read the number off the sheet or --

Q. The number off the sheet or the Bates Stamp number. Either one.

A. Well, the Bates Stamp number didn't come through. I believe it's 01. Is that 01?

MR. REILLY: Yes.

A. The Bates Stamp is 001.

Q. Could you give me the invoice number?

A. 25013.

Q. And the date of the invoice?

A. 7/14/06.

Q. Now, that pertains to the construction of the stairs located on Unit 1, Level 5 over which Mr. MacArthur tripped and fell on September 23rd?

A. No, it does not.

Q. Okay. I'm asking you for the invoices that pertain to the construction of the stair.

A. Bates Stamp 2. Item Number is 17233 dated 11 -- 8/11/05.

Q. 8/11/05?
A. Yes.
Q. Okay. And that pertains to the construction --
A. Yes.
Q. -- of the stairs?
A. Yes. As close as we can get to the date, in my -- in my mind.
Q. Well, I'm asking you: How do you know that invoice is for the construction of the stair?
A. Falls under general plant safety which would fall under the number that all the work is assigned to.
Q. But that could pertain to anything; is that correct?
A. Yes.
Q. So that really -- you don't know. You can't tell us if that pertains to construction of any stairs?
A. No. I can't say definitely that's what that pertains to.
Q. Okay. What else do you have?
A. I have Invoice Bait Stamp 004. Contract Number is 801, and the date is July 14th, 2004. And again, that goes along with the other one which is general plant safety.
Q. So you cannot testify that that --
A. No.
Q. -- that that particular invoice pertains to the

construction of the stair?

A. No. And another invoice, it's Job 801. Contract date is July 14th, '04, and that's date stamped 05. And again, that's general plant safety.

Q. Once again, you cannot tell us or you cannot testify that that particular invoice pertains to the construction of the stairs?

A. No, I can't.

Q. All right. Did you request the invoices, billing statements that pertain to the construction of the stairs?

A. Yes. And that's what I got in return.

Q. Okay. Did you make any further inquiry after reviewing those documents?

A. Yes, I did.

Q. Okay. And what were you told?

A. The explanation that I got was the agreement -- there is no written document because there's an agreement between each company, and it's all handled in the agreement. So one company, one invoice. Another company for whatever work is done.

Q. Okay. Are you telling me that O'Connor Construction does not have those documents?

A. That's what I'm saying. That's what was told to me, and that's what I'm telling you.

Q. Okay. Now, O'Connor Construction was the general contractor on the project, correct?

A. Yes.

Q. All right. And how many employees does O'Connor Construction have?

MR. REILLY: Objection. Beyond the scope of the deposition notice.

A. I can't answer that because I don't know how many we have.

Q. O'Connor Construction Corporation in August of 2003 entered into written agreements with O'Connor Constructors, Inc. which I've marked as Exhibit Number 2 and O'Connor Safety Corporation which is Exhibit Number 3. Are you aware of that?

A. Yes.

Q. Okay. With regard to the relationship between the corporations, could you tell me if the directors and officers of O'Connor Corporation are the same as O'Connor Constructors, Inc.?

MR. REILLY: Objection.

A. No, I can't.

Q. Okay. With regard to the relationship between the corporations, could you tell me if O'Connor Corporation is the managing general contractor and O'Connor Constructors, Inc. is the company that performs the labor?

A. No.

Q. Can you tell me what the relationship is?

A. The relationship -- O'Connor Corporation hires out subcontractors to do the work. O'Connor Safety will sub -- is hired as a subcontractor to provide safety services. O'Connor Constructors is provided to -- is contracted to provide labor help.

Q. Okay. Do you know the manner and method by which O'Connor Corporation is billed for work performed by O'Connor Constructors, Inc.?

A. No, I do not.

Q. Do you know you're -- do you know who at the company is more knowledgeable or most knowledgeable with regard to that information?

A. I would believe it would be Jean Walberg.

Q. And what is her position?

A. He is --

Q. Oh, I'm sorry.

A. I really don't know what his position title is.

Q. Okay. And why do you say he is the person who is most knowledgeable?

A. Because I went to him, and he's the one who acquired the agreements for me.

Q. Now, you've also produced contracts between O'Connor

Constructors, Inc. as a general contractor and O'Connor Corporation and O'Connor Safety Corporation?

A. Yes.

Q. All right. And they also bear the same date of August 7th, 2003?

A. Yes.

Q. Could you tell me as you sit here who the general contractor was? Was it O'Connor Constructors, Inc. or O'Connor Corporation?

MR. REILLY: Are you talking about the Brayton Point project?

MR. TARRO: Yes.

A. It's a two-part answer. I'll give it to you the way I know it. O'Connor Corporation was contracted as a general to do the work for the SCR project. O'Connor Constructors was construct -- was contracted to do foundations and other things for another project that Dominion had going on at the same time.

Q. Okay. With regard to the documents produced, I've marked the agreements between O'Connor Constructors, Inc. as a general contractor and O'Connor Safety Corporation and O'Connor Corporation as Exhibits 4 and 5. With regard to Exhibits 4 and 5, those agreements, are you telling me that those do not pertain to the Brayton Point Power Plant?

A. No. There was a project going on at the Brayton Point Power Plant. There were two separate projects.
Q. So one project O'Connor Corporation --
A. Assisted the SCR which was O'Connor Corporation.
Q. So O'Connor Corporation was the general contractor on that project?
A. Uh-huh. Yes.
Q. And there was a second project?
A. Second project was on the opposite side where they were doing foundations and building pads and stuff for other work that is now going on.
Q. Okay. And the general contractor that -- for that project was O'Connor Constructors, Inc.?
A. Yes.
Q. All right. With regard to the invoicing between the corporations and the billing for services, did O'Connor Safety Corporation bill or submit a bill to O'Connor Corporation?
A. As far as I know, yes.
Q. Okay. Have you brought any of those invoices with you?
A. No. I'm told it's all within the agreement.
Q. Okay. Well, if you look through the agreement, could you tell me if there are any invoices contained in there?
A. No. There is no written invoice.

Q. Okay. You've produced some written invoices today?
A. Yes.
Q. And some bills?
A. Yes.
Q. Okay. Are you telling me that this is the extent of what exists?
A. As far as I know, yes.
Q. Well, you're here on behalf of the corporation, and you're testifying with regard to matters involving the corporation. And specifically, I'm looking for documentation that speaks to the construction of the stairs which is the subject matter of the lawsuit. Do you understand that?
A. Yes.
Q. Okay. And you haven't produced any document that indicates that the stairs were produced on a certain day and billed by O'Connor Constructors, Inc. to O'Connor Corporation; is that correct?
MR. REILLY: Objection. That's not his testimony.
MR. TARRO: All right.
MR. REILLY: We've produced what we believe to be the invoice. There is no specific invoice for stairs.
A. It all falls under the heading, General Safety.
Q. Okay. But there's no way you look at that invoice you

can tell me that the stairs that we're concerned about is encompassed with the invoice; is that correct?

MR. REILLY: Objection. We've produced the documents which we believe relate to the stairs. Again, there is no specific invoice for temporary stairs.

Q. Could you answer the question?

A. There is no invoice that I know of that exists. It's all written in the agreements between the companies.

Q. Okay. Well, what are you referring to is written in the agreements?

A. The contract agreements.

Q. Tell me what language in the contract are you referring to?

A. I can't do that because I'm not in the legal field. I don't know.

Q. Well, you're here on behalf of the corporation speaking to an agreement entered into by the corporation between -- for intercompany billing. Are you telling me you're not the most knowledgeable person with regard to how it's billed and what's billed and the method and manner in which billing occurs?

A. Yes. I can say.

Q. Okay. So who is the person who's most knowledgeable with respect to that?

MR. REILLY: With respect to the incident in question, the construction of the temporary stairs, --

MR. TARRO: Please --

MR. REILLY: -- we've produced this witness as the person most knowledgeable. You're asking the same questions over and over.

Q. You can answer the question. Who's the person who is most knowledgeable with respect to intercompany billing?

MR. REILLY: Objection. Beyond the scope of the deposition.

A. I'm not sure. I don't know who does the billing.

Q. Okay. When did O'Connor Con -- O'Connor Corporation first become the general contractor on the Brayton Point construction project?

A. I don't know. That was before I started working there.

Q. Okay. Can you tell me the date on which the stairs which are the subject matter of the litigation, the wooden stairs that were located on Level 5 of Unit 1 were constructed?

A. Can I tell you the exact date they were constructed?

Q. Yes.

A. I don't believe I can.

Q. Okay. Could you tell me -- could you identify the

names of the individuals who constructed the stairs?
A. No, I can't.
Q. Can you tell me the materials that were used to construct the stairs?
A. No, I can't.
Q. Can you tell me the amount of time it took to construct the stairs?
A. No, I can't.
Q. Could you tell me what amount was billed by O'Connor Constructors, Inc. to O'Connor Corporation for construction of the stairs?
A. No, I can't.
Q. Could you tell me the date when the stairs on Unit 1, Level 5 were removed?
A. No, I can't.
Q. Could you identify the individuals who removed the stairs?
A. No.
Q. Could you identify the amount of time it took for the individuals to remove the stairs?
A. No.
Q. Could you tell me what amount was billed by O'Connor Constructors, Inc. to O'Connor Corporation for the removal of the stairs?

A. No.

Q. Between the date the stairs were installed and the date the stairs were removed, could you tell me if there are any invoices with regard to repairs, modifications, alterations or work performed on the stairs?

A. No.

Q. Okay. With regard to the period between when the stairs were installed and when the stairs were removed, could you tell me the names of individuals who worked on the stairs with regard to any maintenance, alterations, modifications or repairs?

A. No.

MR. REILLY: I'm going to object. This information has already been provided in numerous depositions you've taken in the carpenters directly involved such as Michael Guillmette. This gentleman is here to testify as to production of documents.

Q. Now, with regard to the -- with regard to the Notice of Deposition and the subject matter on which you were going to be questioned today, you understood -- and if you need, you can refer to the Notice of Deposition -- that you were going to be asked questions about the construction of the wooden stairs, correct?

A. Yes.

Q. You understood that you were going to be asked questions about invoices for labor of the construction of the stairs, correct?

A. Yes.

Q. You understood that you were going to be asked about the disassembly of the wooden stairs?

A. Yes.

Q. You understood that you were going to be asked about the repairs of the wooden stairs?

A. Yes.

Q. You were going to be asked about the construction blueprints permitted pertaining to the wooden stairs?

A. Yes.

Q. Okay. And with regard to construction blueprints, did you obtain any construction blueprints for those stairs?

A. No.

Q. Do you know if any exist?

A. To my knowledge, none exist.

Q. Okay. With regard to the Notice of the Deposition, you were requested to produce the O'Connor Safety Corporation Manual, Safety Manual, Policies and Procedures?

A. Yes.

Q. And you have reviewed those documents that were produced?

A. Yes.

Q. And those are all -- are all of the safety manuals and policies and procedure of O'Connor Corporation with regard to the Brayton Point --

A. Yes.

Q. -- project?

A. Yes.

Q. Okay. And I've taken a section out of the manual produced. It's been Bates Stamped Pages 466 through 478. I've marked it as Plaintiff's Exhibit 6, and it's entitled, Subcontractors Safety Program. I'll show that to you.

A. Yes.

Q. You're familiar with that, are you not?

A. Yes.

Q. And with regard to the requirements of a subcontractor where there is a safety issue or an injury, a subcontractor is required to report it to O'Connor Corporation?

A. Yes.

Q. Okay. And is required to report it on the day the event occurs?

A. Yes.

Q. All right. And in this particular case, Berlin Steel was a subcontractor of O'Connor Corporation?

A. Yes.

Q. Okay. And I'm showing you a report that's been marked for -- as an Exhibit 12. And that's the report that was filed with O'Connor Corporation on September 23rd, 2005, correct?

A. Not necessarily. Could have been handed in any time after the date of the injury or --

Q. So you don't know when that was?

A. I don't know when it came in.

Q. Okay. So it could have come in on the 23rd?

A. It could have. It could not have.

Q. Okay. With regard to the -- with regard to the Safety Manual, there's a section for Ladders and Temporary Access Stairways. And it's been Bates Stamped Pages 355 and -- 354 and 355. And I've marked it as Exhibit Number 8. Are you familiar with that section?

A. Yes.

Q. Okay. Now, by looking at that -- that section of the Safety Manual, it sets forth certain requirements with regard to the construction of temporary stairs; is that correct?

A. Yes.

Q. The width of the stair itself?

A. Yes.

Q. The fact -- the necessity for railings?

A. Yes.

Q. Okay. As you sit here today, can you tell me if the

stairs that were the subject matter of this lawsuit that were constructed and placed on Unit 5 -- I'm sorry, Level 5, Unit 1 complied with the requirements as set forth in the Safety Manual?

A. Yes.

Q. Okay. And how do you know that?

A. How do I know that? Because I've used them half a dozen -- well, throughout the extent of the job they were in place, I used them.

Q. Well, can you tell me if the stairs were built in accordance with the requirements as set forth in the safety manual?

A. Yes, they were.

Q. Can you tell me what the width of the stairs were?

A. Exact measurement, I can't give that to you. No.

Q. So you don't know the exact measurements of the stairs, correct?

A. Correct.

Q. You don't know the height of the rails, correct?

A. Correct. No, I do. The height of the rails are 42 inches.

Q. On the stairs that were the subject matter of --

A. Yes.

Q. -- this lawsuit. How do you know that?

A. Because all rails are required to be 42 inches.
Q. Did you measure it?
A. I measure them. The plant measures them. Everybody measures them to make sure.
Q. Well, did you measure those stairs?
A. Those particular stairs, no.
Q. Okay. Do you know if they were measured by anyone?
A. Probably the plant when they go through and do --
Q. Do you have actual knowledge of an individual measuring the stairs?
A. No.
Q. Okay. So as you sit here today, you cannot tell us what the height of the rails were, correct?
A. No.
Q. And you can't tell us the exact width of the stairs, correct?
A. Correct.
Q. So you cannot testify that the stairs were constructed in accordance with the requirements as set forth in the Safety Manual, correct?
A. Correct.
Q. Now, with regard to the -- the Safety Manual, there's a section pertaining to Incident Reporting and Investigation, and the pages are Bates Stamped 307 through 313. And I've

marked it as Exhibit Number 10. You're familiar with that section, are you not?

A. Yes.

Q. And that section requires a certain procedures to be followed if a safety hazard is identified or an injury occurs?

A. Yes.

Q. And the requirements with regard to the filing of reports are set forth in the Safety Manual, correct?

A. Yes.

Q. All right. And the Safety Manual requires you to file three particular reports?

A. A report -- incident report, primary injury report and the doctor's report.

Q. Okay. And how about the analysis report?

A. Job hazard analysis is done by the employees on a daily basis when they work in that area.

Q. Well, that's a report that's required to be prepared in the event of an injury or a safety issue?

A. No. That is a daily report that is required each day of the week before any employees start working on the job.

Q. Okay. The -- if you look at Page or Bates Stamp 307, --

A. Yes.

Q. -- Paragraph 2, it says, the incident report and the

Supervisors Root Cause Analysis are important legal documents; is that correct?

A. Yes.

Q. Keep the following information in mind when investigating an incident and include as much information as possible on the report?

A. Yes.

Q. And those reports pertain to an incident where an individual is injured on the job, correct?

A. Yes.

Q. All right. So the report that I'm referring to that's contained in this section which is entitled the Supervisor's Root Cause Analysis is a report that is required to be filled out in the event someone is injured on the job site, correct?

A. Yes.

Q. Okay. And with regard to the injury sustained by Mr. MacArthur, did you prepare a Supervisor's Root Cause Analysis?

A. No. I did not do the investigation.

Q. Did anyone do an investigation?

A. Donald went out and investigated it. Donald Renovado.

Q. Was a report prepared?

A. No.

Q. Okay. With regard to the date of September 23rd,

2005, who was the supervisor for O'Connor Corporation who was responsible for safety?

MR. REILLY: At Brayton Point Power Plant?

MR. TARRO: At the Brayton Point Power Plant.

A. If you want to say, I was the lead on the job.

Q. What position did you hold?

A. I was a safety representative.

Q. You were -- I asked you about a supervisor.

A. No such title exists.

Q. Okay. All right. I'm going to refer you now to the section entitled, Organization Responsibilities. They have been Bates Stamped Pages 301 through 304. We've marked it as Exhibit Number 11. You're familiar with that, are you not?

A. Yes.

Q. Okay. There's a section there pertaining to supervisors. Do you see that?

A. It's the last page?

Q. Yes.

A. Yes.

Q. And it sets forth the duties and requirements of supervisors?

A. Yes.

Q. Okay. And it's your testimony that there were no supervisors on the Brayton Point --

A. No.

Q. -- job site?

A. That is not my testimony. That was a mistake. I thought you were referring to safety department supervisor.

Q. Well, I'm asking you about the supervisors with regard to the preparation of the report that I previously referred to.

A. Supervisors are the employee -- people in the field who oversee the work through each specific trade.

Q. Well, the supervisor is a key person on a safety team?

A. Yes. They're all supervisors trained in safety.

Q. Okay. Well, who -- who were the supervisors on the Brayton Point Power Plant?

A. John Calenberg was one. Stephen Patriarca was another one. Mike Montero was another one. That's all I can remember right now.

Q. Now, did these supervisors report to you, or did you report to them?

A. They report to a project manager, and I report to them.

Q. You report to them?

A. Yeah.

Q. Okay. Did you discuss with them the incident involving Mr. MacArthur?

A. I did not. No.

Q. With regard to this Brayton Point Power Plant project, who was the safety manager?

A. There was no designated safety manager.

Q. Who was the project manager?

A. Peter Gravalesi.

Q. Who was the project superintendent?

A. John Calenberg.

Q. Who was the project -- project safety monitors/representatives?

A. That would be myself and Donald Renovado.

Q. Who was the field superintendent?

A. I can't answer that.

Q. Who was the foreman?

A. There were multiple foremen.

Q. Well, the foreman for safety, who was that?

A. No. There were no foremen for safety.

Q. Who would hold weekly safety training on the job site?

A. Depending on which contractor it was, the contractor would hold their own safety training or safety meetings.

Q. For O'Connor Corporation?

A. For O'Connor Corporation, Don Renovado would do the safety meetings. When Don wasn't around, I would take over.

Q. I'm showing you a document that has been marked

Exhibit 13. Could you just identify that document?
A. It is a job safety planning analysis from Berlin Steel.
Q. And who was responsible for preparing that document?
A. This -- their -- the employees sit down on a prejob meeting before they go to work in the morning and complete a JSA every day.
Q. Okay. And could you tell me where that record was maintained?
A. This was maintained in Berlin's office, and a copy was given to me.
Q. Okay. And what information is contained on that form?
A. It's basically emergency evacuation points, where to assemble in case something happened on the job site or there was an evacuation of the job site, phone numbers to report to Dominion. In case something happened, we had to notify them first. Watch engineers. Security. Specifically, it was a tool that the foreman and the job employees would use to line out their work process for the day, record any hazards that would be related to the work that they were doing and discuss any potential remedies for situations that may crop up.
Q. And who was in attendance at that meeting on the 23rd of September, 2005?
A. Let's see. John MacArthur. Mike Knips. Michael

Burreo. Skip -- I don't know. I can't read -- half the names I can't read.

Q. Okay. I've also marked for this deposition two other pages from the Safety Manual. The first one is marked Exhibit Number 7, and it appears to be a memo from Leon Danielson. Are you familiar with that?

A. Yes.

Q. What position did Mr. Danielson hold back in 2005 in O'Connor Construction?

A. He was the person who operated O'Connor Safety.

Q. I'm sorry?

A. He's my boss for O'Connor Safety.

Q. Okay. Did he work for O'Connor Corporation, O'Connor Constructors, Inc. or O'Connor Safety Corporation?

A. I don't know.

Q. And I'm going to show you a Safety Policy Statement which is marked as Exhibit Number 8 and ask you if you're familiar with that?

A. Yes. Yes.

Q. And once again, Mr. Danielson's name appears on this as a managing -- Manager Construction Services. Do you know for what company that was for?

A. No, I don't.

Q. Now, with regard to the Notice of Deposition, you were

asked to produce any and all photographs taken at any time of the wooden stairs located at Unit 1, Level 5.

A. Right.

Q. Could you tell me what steps you took to find out if there are any such photographs?

A. I looked everywhere. I asked everybody if anybody had any pictures on it, and nobody could tell me they had pictures.

Q. Who did you ask?

A. I asked Donald Renovado. I asked the carpenters if they had any. I asked the project manager. Nobody could produce anything.

MR. TARRO: May I see the original documents?

(Mr. Reilly hands documents to Counsel)

(Counsel perusing documents)

(Counsel hands documents back to Mr. Reilly)

Q. Okay. With regard to the Notice of Deposition, you understood that you were going to be testifying on behalf of the corporation with regard to the method of searching for documents requested --

A. Yes.

Q. -- in the notice. The completeness of the documents?

A. Yes.

Q. All right. And the authenticity of the documents, --

A. Yes.

Q. -- correct. And as I understand, you've produced any and all documents in the possession, custody or control of O'Connor Corporation with regard to the construction of the stairs, maintenance of the stairs, any repairs, alterations or modification of the stairs; is that correct?

A. Yes.

Q. Do you know if any documents have been lost, misplaced or destroyed?

A. I have no idea.

MR. TARRO: I have no further questions.

MR. REILLY: No questions.

MS. PARKER: No questions.

(DEPOSITION CONCLUDED AT 11:00 A.M.)

C E R T I F I C A T E

I, Heather A. Lussier, do hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to Rules of Civil Procedure of the Superior Court, especially, but without restriction thereto, under Rule 30 (e) of said Rules; that the witness was first sworn by me; that transcript contains a true record of proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand this 31st day of July, 2007.

________________________________________________________

HEATHER A. LUSSIER, CSR
Notary Public, State of Rhode Island