UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JOHN MACARTHUR | : | |
| | : | |
| vs. | : | C.A. NO. 06-478S |
| | : | |
| O'CONNOR CORPORATION and | : | |
| O'CONNOR CONSTRUCTORS, INC. | : | |
| | : | |
| vs. | : | |
| | : | |
| THE BERLIN STEEL | : | |
| CONSTRUCTION COMPANY and | : | |
| HARTFORD FIRE INSURANCE | : | |
| COMPANY | : | |

DEPOSITION OF DANIEL THIBIDEAUX

Thursday, May 10, 2007

11:00 a.m.

THE LAW FIRM OF THOMAS A. TARRO, III, ESQ.

The Summit East - Suite 330

300 Centerville Road

Warwick, Rhode Island 02886

– – –

Heather A. Lussier, CSR
Capitol Court Reporting, Inc.
931 Jefferson Boulevard

Warwick, Rhode Island 02886

(401) 739-3600

APPEARANCES

For the Plaintiff:

THOMAS S. TARRO, III, ESQ.
THE LAW FIRM OF THOMAS A. TARRO, III, ESQ.
The Summit East - Suite 330
300 Centerville Road
Warwick, Rhode Island 02886

For O'Connor Corporation and O'Connor Constructors, Inc.:

JAMES H. REILLY, ESQ.
KELLY, KELLEHER, REILLY & SIMPSON
146 Westminster Street, Suite 500
Providence, Rhode Island 02903

For The Berlin Steel Construction Company:

C. RUSSELL BENGSTON, ESQ.

CARROLL, KELLY & MURPHY

One Turks Head Place, Suite 400

Providence, Rhode Island 02903

For Hartford Fire Insurance Company:

AMY A. PARKER, ESQ.

MORRISON MAHONEY, LLP

121 South Main Street, Suite 600

Providence, Rhode Island 02903-7141

# INDEX


| DEPONENT: | PAGE |
|---|---|
| DANIEL THIBIDEAUX | |
| DIRECT EXAMINATION BY MR. TARRO | 5 |
| CROSS-EXAMINATION BY MR. BENGSTON | 18 |
| CROSS-EXAMINATION BY MR. REILLY | 20 |
| REDIRECT EXAMINATION BY MR. TARRO | 25 |

EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Plaintiff's | | |
| 1 | Notice of Deposition (4 PP) | 5 |
| 2 | Incident Report Form (1 PP) | 5 |
| 3 | Site Inspection Form (2 PP) | 5 |
| | The Berlin Steel Construction Company Accident/Injury Investigation Report (1 PP) | 29 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Defendant's | | |
| A | Document entitled, John MacArthur Incident 11/4/05 (1 PP) | 21 |


(ALL EXHIBITS ATTACHED TO TRANSCRIPT)

(COMMENCED AT 10:55 A.M.)

(Plaintiff's Exhibit Numbers 1, 2 and 3 marked)

DANIEL THIBIDEAUX

Being duly sworn, deposes and testifies as follows:

DIRECT EXAMINATION BY MR. TARRO

Q. Mr. Thibideaux, what is your home address?
A. 106 Central Street, Leominister.
Q. And your home telephone number?
A. 978-534-1526.
Q. Do you have a mobile phone?
A. Yes.
Q. And what is that number?
A. 617-201-0148.
Q. I represent John MacArthur in this lawsuit brought against O'Connor Corporation concerning an incident that occurred on September 23rd, 2005. I'm going to be asking you some questions concerning events that occurred on that day. And what I'm looking for is your honest answer and just best recollection. Do you understand that?
A. Yes.
Q. Okay. You also understand that you've taken an oath to tell the truth?
A. Yes.
Q. And with regard to this deposition, what have you done

to prepare for it?
A. Nothing.
Q. Okay. Have you spoken to anyone concerning the events of that day or your involvement with regard to filling out of any reports?
A. No.
Q. Okay. And how is it -- who contacted you to be present here today?
A. I got the call from my boss, Lee.
Q. And who is your boss?
A. Lee Danielson.
Q. And what is his position?
A. He's construction services manager.
Q. And what company does he work for?
A. O'Connor Corporation.
Q. Okay. There is also an O'Connor Safety Corporation?
A. Yes, there is.
Q. All right. Who do you work for?
A. That's Lee Danielson, also.
Q. So you work for O'Connor Safety Corporation?
A. Yes.
Q. Okay. Now, you also -- strike that.
Don Renovato, he's also an employee of O'Connor Safety Corporation?

A. Yes.
Q. And how long have you known Mr. Renovato?
A. About five years.
Q. And in terms of your position on September 23rd, 2005, who did you report to?
A. I reported to the home office.
Q. Okay.
A. Well, the project manager on-site.
Q. And who would that be?
A. Peter Gravallese.
Q. Can you spell his last name?
A. G-R-A-V-A-L-L-E-S-E.
Q. Okay. And did you oversee anyone in your department?
A. Just the people who were working on my shift day or night.
Q. Okay. Who would that have been on September 23rd, 2005?
A. On the shift, that would have been Don Renovato, and that was it.
Q. And what was the time period for the day shift?
A. Day shift went from 7:00 to -- the best of my recollection I think that was 7:00 to 5:00.
Q. Okay. And the night shift?
A. The night shift went from 6:00 to -- I want to say a

twelve-hour shift, so it was 6:00.
Q. Okay. Who worked the night shift back in September of 2005?
A. And what position are you referring to?
Q. The individuals he would oversee.
A. I would have to look at the time sheets on that. I don't recall who was the night shift at that time.
Q. Okay. Was there one or more safety representatives?
A. Two. Minimum of two.
Q. Minimum of two. So you would have two during the day and two at night?
A. Yeah.
Q. Okay. Now, with regard to your duties and responsibilities, okay, on September 23rd, 2005, what did they consist of?
A. Basically, my responsibilities for the company at that job site were maintain the job site and operating function to take in any reports, field inspections, deal with the client or any of the subcontractors that worked with us on issues that might come up in the field.
Q. Okay. When you say field inspection, what did the field inspection consist of?
A. Walk-throughs of the job site to look at the work areas that were ongoing at the time. See if there were any

violations of OSHA rules, regulations or company policies and procedures.

Q. Okay. Now, the company's policies and procedures are set forth in a written manual?

A. Yes.

Q. Okay. And could you describe that written manual?

A. The O'Connor safety manager is basically broken down into divisions by the OSHA code. Policies are set up that are written to either exceed OSHA regulation or meet OSHA's regulations for the job site.

Q. How many volumes is the manual?

A. One.

Q. Where is the manual maintained?

A. For the job, there's one maintained on the job at all times.

Q. Is the manual that is used today the same one as it was used back in September of 2005?

A. I believe so. Yeah.

Q. And the safety manual contains OSHA regulations?

A. It contains O'Connor's policies that are written to the OSHA regulations.

Q. Okay. As it pertains to on-site job safety?

A. Yes.

Q. All right. Now, who was responsible back in September

of 2005 for photographing areas where there was safety concerns?

A. If there was a need for photographs to be taken, that would be the person who was doing the inspection on the field.

Q. Okay. Now, you would do inspections in the field on a daily basis?

A. On a daily basis, I would take walk-throughs if I wasn't tied down to the office. Yeah.

Q. Did you have any particular schedule that you followed?

A. No.

Q. Did Mr. Renovato have a particular schedule that was assigned to him?

A. No.

Q. All right. Were there any particular units or buildings assigned to Mr. Renovato?

A. No.

Q. With regard to inspections, it was the policy and practice of O'Connor -- O'Connor Corporation or O'Connor Safety Corporation to prepare site inspection forms?

A. Yes.

Q. Okay. And those would be prepared on a daily basis?

A. On a daily or weekly basis depending on what the amount of work was that was going on at the time.

Q. And who would prepare those reports?
A. Feedback would come to me, and I would write the reports.
Q. Okay. And how would the feedback be brought to you?
A. A representative that was out in the field would come in and tell me what was going on, and I would document that on a report.
Q. Now, when Mr. Renovato went out and performed his site inspections, would he take a form with him?
A. No.
Q. Okay. He would not?
A. No.
Q. So he didn't have any form that was used as a practice when site inspections were made by the safety representative?
A. No.
Q. Okay. When the information is brought back to you, how is it brought back to you? In written form?
A. Usually in a notepad or verbal.
Q. Okay. And with regard to the notepad, are those maintained for a period of time?
A. No.
Q. What is the retention policy?
A. There isn't one.
Q. With regard to the site inspection form that we've

marked as Exhibit Number 3, okay, how frequently are these forms prepared?

A. These are prepared as I stated earlier depending on what the job is, what the amount of work that is going on at the time either on a daily or a weekly basis.

Q. Okay. And this is a form that was prepared on -- for the date of September 23rd, 2005?

A. Yes.

Q. And this form was prepared by you?

A. Yes.

Q. Okay. Was it prepared on September 23rd, 2005, or was it prepared at --

A. Yes. Yes.

Q. It was prepared on that day?

A. Yes.

Q. Okay. And is this form maintained on a computer?

A. I have a computer printout for it. Yes.

Q. Okay. So you have an electric -- electronic file pertaining to site inspections; is that correct?

A. No. That's not correct. What I do is I make the form on the computer, print it out, and it goes into a hard copy book.

Q. Okay. Do you also maintain a logbook?

A. No.

Q. Okay. Mr. Renovato testified that a logbook was contained with regard to any safety issues that were observed on the site inspection. Is he incorrect?
A. The logbook, basically, is this right here, this second page.
Q. My question to you is: Is he incorrect in that statement?
A. No.
Q. All right. Is there a logbook where you make handwritten entries?
A. No.
Q. Okay. In addition to site inspection forms, you also maintain Incident Report Forms?
A. Yes.
Q. Okay. And I've marked in this deposition an Incident Report Form, and that's a form of O'Connor Safety --
A. Yes.
Q. -- Corporation. And your signature appears on this form?
A. Yes.
Q. All right. And it's a report prepared by you, and your signature is in the lower left-hand corner?
A. Yes.
Q. And it's dated September 23rd, 2005?

A. Yes.

Q. Okay. And that was the date that you prepared the report, correct?

MR. REILLY: Objection.

A. Yes.

Q. With regard to the job location, is it Brayton Point job site?

A. Yes.

Q. And on September 23rd, 2005, a report was made to you about a safety concern with regard to wooden stairs on the fifth floor of Unit 1; is that correct?

A. Yes.

Q. And who brought that to your attention?

A. Don did.

Q. And what time did he bring that to your attention?

A. I really don't recollect the time.

Q. When you say Don --

A. Don Renovato.

Q. Okay. Did you ask him to take a photograph of the stairs?

A. No.

Q. Okay. Did you go out and inspect the stairs?

A. No.

Q. Did you instruct anyone to photograph the stairs?

A. No.

Q. Was it the policy and procedure of O'Connor to take a photograph of an area where there was a reported safety concern?

A. No.

Q. With regard to the report, the incident report you prepared on September 23rd, 2005, you indicated that the employee's complaining of pain in his right hip area. Where did you obtain that information from?

A. From Don.

Q. Okay. And he reported that to you on September 23rd, 2005, correct?

A. Yes.

Q. Is that correct?

A. Yes.

Q. And he also states that he, the employee is hearing a clicking sound. Is that information you received from Don Renovato on September 23rd, --

A. Yes.

Q. -- 2005 as well?

A. Yes.

Q. Okay. With regard to this form, it indicates -- well, the question here is: Did an unsafe condition cause the accident? And it's circled, yes. That's your handwriting?

A. Yes.
Q. All right. And it says, broken step; is that correct?
A. Yes.
Q. That's your handwriting?
A. Yes.
Q. All right. Is there anything on this document which we've marked as Exhibit Number 2 that is not your handwriting?
A. No.
Q. And you also indicate here to the following question, Did an unsafe or intentional act by the employee cause the accident? And your response was no; is that correct?
A. Correct.
Q. Now, that information you got from Don Renovato, or did you speak with Mr. MacArthur directly?
A. Don Renovato.
Q. Okay. So all the information contained on Exhibit 2 came from Don Renovato, correct?
A. Yes.
Q. Now, you also indicate that the stair was repaired; is that correct?
A. What corrective action was to be taken at the time? Stair repaired. Yes.
Q. Okay. And where did you obtain the information that the stair was repaired?

A. From Don that the carpenters were going to be taking care of it.

Q. Did he tell you what repairs were going to be made?

A. No.

Q. Okay. Did you -- did you learn at any point in time what repairs were made?

A. After the fact, I did. Yes.

Q. Okay. What repairs were made?

A. Basically, the carpenter went over and looked at it, didn't find anything wrong with the step, but he did throw in a couple of extra screws on the top step to make sure it stayed secured.

Q. Did you ever go and inspect the step --

A. No.

Q. -- before the repairs were made?

A. No.

Q. So you don't know the condition of the stair before the repairs were made; is that correct?

A. No. That's correct.

Q. Okay. Did you ever speak with Mr. MacArthur about the event?

A. No.

Q. Did you speak to anyone other than Don Renovato about the event?

A. No.
Q. Have you made any other statements or reports concerning the event?
A. No.
Q. There's been some testimony that someone was on-site taking photographs of the power plant facility that day. Do you have any knowledge of that?
A. No.
Q. Okay. Do you know of anyone employed by O'Connor or any of the other subcontractors who was on-site who would photograph the job site?
A. Not to my knowledge.
MR. TARRO: Okay. I have no further questions. Thank you.

CROSS-EXAMINATION BY MR. BENGSTON

Q. My name is Russell Bengston. I represent Berlin. Just a couple of things. Were you familiar with these stairs before this incident occurred?
A. Yes.
Q. Had you gone up and down them before the incident occurred?
A. Yes.
Q. When had you last gone up and down these stairs before this incident was reported?

A. I would say maybe two or three days before that.
Q. Do you remember how the stairs were constructed?
A. I believe they were constructed of wood. There was like two steps, and the top of the step was covered with a piece of plywood to level it off to the grading.
Q. That's something you now recall?
A. Yeah.
Q. All right. Do you understand in this case what the plaintiff is alleging, that there was a two by four on the top that was loose or tilted or something like that?
A. No. I didn't know what he's alleging.
Q. Okay. But it's your memory that the top stair had a piece of plywood across the entire top of it?
A. Yeah.
Q. Do you remember how that piece of plywood was secured to any other portion of the building or the premises? Do you understand what I'm trying to say?
A. What you're trying to say is it's secured to the physical building itself?
Q. Correct. Do you remember how that was done?
A. No, I don't.
Q. After September 23rd, when would you have next gone up or down those stairs? Within a few days?
A. I would say within a few days. Yeah.

Q. Did you notice anything different about the stairs when you had looked at them a few days after the incident --
A. I didn't look at them.
Q. -- was reported to you?
A. I didn't look at them.
Q. Well, you went up and down them?
A. Yes.
Q. Okay. Going up and down the stairs, did anything catch your eye as to being different than it was on the occasions that you had used the stairs before the incident?
A. No.
Q. What was your title on this particular job?
A. Safety representative.
Q. And is that still your title at the company?
A. Yes.
MR. BENGSTON: Thanks very much.
MS. PARKER: No questions.
MR. REILLY: I have some questions.
MR. TARRO: Okay. Go ahead.
CROSS-EXAMINATION BY MR. REILLY
Q. Dan, I just want to go over a time line with you. First of all, you brought with you today the site inspection form which you prepared on September 23rd, 2005. I take it you prepared this at the end of the day?

A. Yes.
Q. Okay. And Item 11 on the second page says Unit 1, 5th floor, employee tripped on stairs. Don Renovato to check out issue. No problem found. Carpenter was asked to look and see if there was something not noticed. Carpenter did not see anything wrong. So did you get all that information from Renovato?
A. Yes.
Q. Did anybody else provide you with any of that information?
A. No.
MR. REILLY: Okay. Now, I'm going to have marked as Defendant's A a note which is dated November 4th, 2005 which is about six weeks after this date.
(Defendant's Exhibit A marked)
Q. Now, showing you what's been marked as Exhibit A, is that your signature?
A. Yes.
Q. And is that the date that you prepared this report, November 4th, 2005?
A. Yes.
Q. I just wanted to go over this with you. It says, On November 4th, 2005, John MacArthur came in today complaining about an injury that happened on Friday, September 23rd, 2005

at 13:30 p.m. Now, when you said he came in, did he come to your office?

A. He came in on that day. Yes.

Q. Okay. Did you talk to him personally?

A. That day, yes.

Q. Okay. And did you prepare this report after he came in to see you that day, November 4th?

A. Yes.

Q. And he was talking about an incident that had occurred about six weeks earlier, correct?

A. Yes.

Q. And I'm showing you the first paragraph. It talks about the incident itself. Did you get that -- all of that information in that first paragraph from MacArthur himself? Is that what he told you?

A. That came from him and the incident report from their company.

Q. Okay. So you had the company's incident report, and you were talking to him that day when he was coming in to tell you about it?

A. Yes.

Q. Now, in the second paragraph you stated, Employee opted not to go to medical facility at the time, so a file or report was maintained. Is that no file or report?

A. That is this incident report.

Q. Okay. Now, I'm going to get to that in a minute. Then you go on to state --

MR. TARRO: Could I just have the record reflect that the incident report is referred --

MR. REILLY: Exhibit 2.

MR. TARRO: Exhibit 2?

MR. REILLY: Yes.

Q. It says, The stair was looked at by Don Renovato, and Don contacted the carpenters to fix the stair. See carpenter written statement. Is that the statement that Mike Guillemette gave?

A. Yes.

Q. Nothing else was heard from Mr. MacArthur until November 4th, 2005. So this is, basically, in your report between the date of the incident when Renovato told you about it and you prepared the site inspection report until November 4th you had heard nothing at all about this incident, correct?

A. Right.

Q. Okay. And it goes on in the third paragraph to state on November 4th, 2005 Mr. MacArthur came in complaining of pain in his right hip area. He stated he is hearing a clicking sound the -- it says the has. I presume you meant this has gradually become worse since the incident on November

23rd, '05; is that correct?
A. Yes.
Q. Now, I'm going to go back to that incident report which is Exhibit 2. And I know it's dated September 23rd, '05, and it's the date of the incident and you dated it September 23rd, '05?
A. Yes.
Q. But it says, How did the accident occur? Employee's complaining of pain in right hip area. States he is hearing a clicking sound. Pain has gradually become worse since 9/23/05 incident which seems to indicate that this was prepared sometime after the date of the incident.
A. Yes.
MR. TARRO: Objection.
Q. You can answer.
A. If you look at the top of the page, there is a report number, 05-4-11. That's the date that this was written.
Q. Okay. So though you dated it September 23rd, '05, it was actually prepared on November 4th, '05?
MR. TARRO: Objection.
A. Yes. This is reported to that date.
Q. Okay. I just want to go over the report number. It's 05-4-11. That means the 11th month, the 4th date, year 2005?
A. Yes.

MR. TARRO: Objection.

Q. So this Incident Report Form was prepared after MacArthur came in on November 4th, 2005 complaining?

MR. TARRO: Objection.

Q. Is that correct?

A. Yes.

MR. REILLY: That's all I have.

MR. TARRO: Any other questions? I have a few.

REDIRECT EXAMINATION BY MR. TARRO

Q. Let me ask you something. Is it your custom and practice to prepare forms or statements similar to the one that you've -- that has been marked as Defendant's A?

A. This one here?

Q. Yes.

A. When there is an incident that isn't filed right off the bat or the employee doesn't want to go to the doctor's office, yeah.

Q. Well, you had information on September 23rd about the incident involving Mr. MacArthur, correct?

A. Right.

Q. 2005. You prepared -- you indicated in your direct testimony a report -- an incident report that was dated September 23rd, 2005, correct?

A. Uh-huh.

Q. Is that correct?
A. Yes.
Q. Okay. And now, are you telling me you did not prepare any incident report on that date?
A. No.
Q. Okay. So with regard to the incident report you prepared on September 23rd --
MR. REILLY: Which exhibit are you referring to?
Q. With regard to the incident report you prepared on September 23rd, 2005, was that the report that we've marked as Exhibit Number 2?
A. This report was filed on 5 -- on 11/4/05.
Q. I'm asking you when you prepared it?
A. It was prepared on 4/11/05. Yeah. 11/4/05.
Q. What did you prepare on September 23rd, 2005 when the --
A. The incident report right here. This is the incident report that I prepared right here.
MR. REILLY: Let the record show it's the site inspection form that he's referring to.
Q. You're referring to Exhibit Number 3? It's the second page?
A. Yes.

Q. Okay. And your testimony is that's the incident report?

A. Yes.

Q. Is that the incident report that is used by O'Connor Safety Corporation to record information concerning on-site injuries?

A. No.

Q. Okay. What form is used to report on-site injuries?

A. On-site injuries are filled out one of these -- what is this? Number 2. Exhibit Number 2 is filled out when a person goes to a medical facility.

Q. When a person doesn't go to a medical facility but is injured on-site, what form is filled out?

A. A first aid notation is made on the inspection sheet.

Q. With regard to the statement you made -- I asked you if you spoke to anyone else concerning the event, if you ever spoke to Mr. MacArthur, and you indicated you had not. Is your testimony now that you did speak to him after this incident about the incident?

A. I didn't speak to him until the 11th of '05.

Q. So your first time you spoke to Mr. MacArthur was November 4th of 2005 --

A. Yeah.

Q. -- concerning what happened?

A. Yes.
Q. You never spoke to him before that?
A. No.
Q. Okay. And all the information you had obtained before that came from Mr. Renovato; is that correct?
A. Yes.
Q. Now, with regard to the incident report prepared by George Prior, when did you receive that?
A. I really can't remember right now.
Q. Did you receive that on September 23rd, 2005?
A. I don't recollect.
Q. Well, what's the custom and practice of O'Connor with regard to the filing of incident reports?
A. Normally, the employee or -- the employee files with his company a report, and the accident report is then supposed to come to -- for lack of a better term -- controlling contractor.
Q. What records do you have which would indicate the date on which you received the Berlin Steel Construction Company Accident/Injury Investigation Form?
MR. REILLY: Objection. There's no evidence they've ever received this. That's been produced by you in this case.
Q. Can you answer that question?

A. Could you say it again, please?

MR. TARRO: Could you read that, please.

(PREVIOUS QUESTION READ BACK BY COURT REPORTER)

A. I don't have any.

Q. You don't have any records which would indicate that?

A. Right.

Q. Okay. Do you maintain a log or a special file when you receive incident reports that are filed with a subcontractor --

A. No.

Q. -- on a job site. Okay. How are they -- how are the documents maintained?

A. Usually, when there is an incident or an injury, it's reported. It comes in right away. If the person goes off to a medical facility, it's documented right there and put into the hard copy book.

Q. Okay. Showing you what we've marked as Exhibit Number 2 -- actually, I'll mark this as Exhibit Number 4 of this deposition.

(Plaintiff's Exhibit Number 4 marked)

Q. Showing you Exhibit Number 4, that's the incident report from Berlin Steel. You saw that report prior to today, correct?

MR. REILLY: Objection.

A. No.

Q. You never saw that report prior to today?

A. Not to my recollection I haven't.

Q. Well, you testified just a short time ago when you were being questioned by Attorney Reilly that the information contained in your statement which is marked as Defendant's A came in part from the incident report; is that correct?

A. No. It came from the employee when I spoke to him on 4/11 or 11/4.

Q. But you also indicated it came from the incident report, did you not?

MR. REILLY: Objection. He was referring to the site inspection form. He's already explained that.

MR. TARRO: Jim, --

MR. REILLY: He's explained that.

MR. TARRO: Jim, please, you cannot coach the witness.

MR. REILLY: You're going over something he's already answered.

MR. TARRO: You can't coach the witness.

MR. REILLY: You've got three different inspection forms. You're not referring to which one.

MR. TARRO: Could you read the question back.

(PREVIOUS QUESTION READ BACK BY COURT REPORTER)

Q. You can answer that.
A. The incident report referring to the document that I made on 9/23 which is -- I don't know what exhibit it is.
Q. All right. When you were asked about the information contained in the first paragraph of your statement which is marked as Defendant's A, --
A. Uh-huh.
Q. -- okay, you indicated it came from Mr. MacArthur in the incident report. Could you tell me what information contained in Paragraph -- the first paragraph of Defendant's Exhibit A came from the incident report?
A. He came in. He told me about the incident that happened on 9/23, that he twisted his knee, was walking out of the door on Level 5 of Unit 1. He stated there was a piece of wood on the stairs. He tripped down the stairs and almost fell on his face. And then since then he's -- he stated that he's also heard a popping in his right hip area.
Q. So what information contained in Paragraph 1 came from the incident report as opposed to Mr. MacArthur?
A. I'm not understanding what you're saying.
Q. You testified that the information that you put down in your statement, --
A. Yes.
Q. -- in Paragraph 1 came from two sources, Mr. MacArthur

and the incident report; am I correct?
A. Yes.
Q. Okay. Could you tell me what information came from the incident report as opposed to Mr. MacArthur with regard to the first paragraph of your statement of November 4th, 2005?
A. When Mr. MacArthur came into the office on 11/4, he told me or reminded me of the incident that happened on 9/23, basically, relating to the stairs on Unit 1, Elevation 5 going out to the air heater work area. He stated he tripped on it, almost fell down the stairs. That's what he told me.
Q. Okay. I'm asking you in Paragraph Number 1 of your statement of November 4th, 2005 what information did you ascertain or cut out of the incident report that you put into Paragraph Number 1 as opposed to information you obtained from Mr. MacArthur?
A. They're both the same.
Q. So you can't answer that?
A. No. They're both the same.
Q. Okay. What incident report are you referring to then?
A. This --
MR. REILLY: Could we see the exhibit number so we have a record, please.
Q. Exhibit Number 3?
A. Yes.

Q. Okay. And could you state what is contained on the incident report?

A. The incident report says Item 11, Unit 1, 5th floor, he tripped on stairs. Don Renovato checked out the issue. No problem found. Carpenter was asked to look and see if there was something noticed. The carpenter did not see anything wrong.

Q. And this does not say it's an incident report; it says site inspection form, right?

A. Right. Correct.

Q. And you have separate forms that are used for incidents and safety issues, correct?

A. Yes.

Q. All right. How many different forms?

A. I do an inspection form which is Exhibit A. We do an accident/injury or incident report which is Exhibit Number 2.

Q. Any other documents you use?

A. No.

Q. Do you know -- now, with regard to the statement, your statement dated November 4th, 2005, did you fax that to anyone?

A. Just my home office.

Q. Okay. And how do you know you faxed it to your home office?

A. Because that's where I send all my reports.
Q. Did you speak to Mr. Guillemette concerning the stairs?
A. No.
Q. Do you know who Mr. Guillemette is?
A. He is a carpenter foreman. Yeah. I know who he is.
Q. Did you fax to your home office his statement?
A. I either -- myself directly, no. I would believe Don did that.
Q. You didn't take a statement from him?
A. No, I did not.
Q. Do you know if Mr. Renovato took a statement from him?
A. I would assume he took it.
Q. Why do you make that assumption?
A. Because I didn't take it.
Q. Okay. And it would either be you or Mr. Renovato who would have taken the statement?
A. Yes.
Q. Okay. Do you know what happened to the stairs?
A. Do I know what happened to the stairs?
Q. Yes.
A. From what I was told, it got repaired. A piece of plywood was put on top of it after the carpenter didn't notice anything really wrong with the stairs. He didn't put another

piece. He screwed down -- put additional screws into it.
Q. With regard to the stairs, how wide were they?
A. How wide were they? Measurementwise I can't -- I don't know.
Q. Had railings on both sides?
A. Yes.
Q. How high up were the rails?
A. Top rail I believe is 42 inches.
Q. Okay. So you had a rail on the right side and on the left side?
A. Yes.
Q. How many stairs were there?
A. Two, I believe. I believe there were two.
Q. Two stairs and then the platform on top?
A. Yeah.
Q. All right. Now, let's go back to the incident report which we've marked as Exhibit Number 2. Do you have that?
A. Yes.
Q. In this incident report, you wrote down in your own handwriting that there was a broken step, correct?
A. Yes.
Q. All right. If you look at Exhibit Number 3, your site inspection report, --
A. Yup.

Q. -- there's no indication that there's a broken step, correct?
A. Right.
Q. Now, your testimony is that you prepared the incident report, Exhibit Number 2 even though it's dated September 23rd, 2005, correct, on November 4th, 2005?
A. Yes.
Q. That's your testimony. Where did you get the information from that there was a broken step?
A. That was what I originally put down. And when I didn't have any information -- because the complaint came in as a broken step.
Q. So on September 23rd, 2005, are you telling me that you prepared an incident report on September 23rd, 2005 that indicated a broken step?
A. No. I'm not saying that.
Q. Where is this original form?
A. Canton office I assume.
MR. TARRO: I would like to see the original form if I could, the original.
MR. REILLY: You're the one who has produced this document.
MR. TARRO: I didn't produce this Incident Report Form, Exhibit Number 2.

MR. REILLY: It's noted. It was original production. Look right at the bottom. You put MacArthur vs. O'Connor et. al. You produced it with your initial production of documents.

Q. Is this a document that is maintained by O'Connor Safety Corporation in the usual and regular course of its business?

A. Yes.

Q. I would like to --

A. It is until we get a subcontractor that comes on-site that doesn't have an accident report and we give him copies of our form. And if you notice at the top, it does not say O'Connor on it.

Q. Is this your form that you used -- you prepared in your own handwriting?

A. Yes.

Q. All right. Is this maintained by you at your office?

A. Yes.

Q. Okay. Do you have the original?

A. It should be in the office.

MR. TARRO: I would like to see the original.

MR. REILLY: We'll see if there is one. You made your request.

MR. TARRO: Okay. Thank you. I have no

further questions.

MR. REILLY: All set.

(DEPOSITION CONCLUDED AT 11:30 A.M.)

C E R T I F I C A T E

I, Heather A. Lussier, do hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to Rules of Civil Procedure of the Superior Court, especially, but without restriction thereto, under Rule 30 (e) of said Rules; that the witness was first sworn by me; that transcript contains a true record of proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of May, 2007.

____________________________________

HEATHER A. LUSSIER, CSR
Notary Public, State of Rhode Island